**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

| | | |
|---|---|---|
| **ALABAMA TEACHERS CREDIT UNION,** | ] ] ] | |
| **Plaintiff,** | ] ] | |
| **v.** | ] ] | **CASE NO.: 4:16-cv-2027-KOB** |
| **DESIGN BUILD CONCEPTS, INC., et al.,** | ] ] ] | |
| **Defendants.** | ] ] | |

## <u>MEMORANDUM OPINION</u>

Rain drops kept falling on their heads…or at least leaking through the roof, ceilings, and walls of the building that the Defendant's predecessor designed and constructed. Yet Alabama Teachers Credit Union patiently endured ten years of water torture before finally seeking legal relief from its soggy dilemma. Ten years of rain showers, leaking into ATCU's building, with every drop serving as a reminder to ATCU of the Defendants' alleged failure to mop up the situation. Now, the mop has been handed to the court, albeit a little too late.

Before the court is Design Build/IBT LLC's ("IBT") Motion for Summary Judgment (doc. 78); Plaintiff Alabama Teachers Credit Union's Motion to Strike IBT's motion for summary judgment (doc. 83); ATCU's Motion to Strike IBT's Reply in Support of Summary Judgment (doc. 97); and ATCU's Motion for Leave to File a third Amended Complaint (doc. 82).

ATCU and IBT submitted a "Joint Proposed Plan for Initial Limited Discovery" in this case on June 20, 2017, which the court adopted on June 26, 2017. (Docs. 56, 57). As agreed in the joint plan, the court's order limited discovery to issues related to IBT's affirmative defenses and an

1

asset purchase agreement between IBT and Design Build Concepts, Inc.[1] After IBT filed its

motion for summary judgment on September 15, 2017, ATCU filed motions to strike IBT's

motion for summary judgment and IBT's reply brief in support of summary judgment, arguing that

IBT's briefings exceeded the limited scope of discovery. (Docs. 83, 97). ATCU's motion for leave

to file a third amended complaint arises from its alleged discovery of evidence that IBT

fraudulently suppressed material information regarding design flaws in ATCU's building. The

motion seeks to add a ninth count of fraudulent suppression.

As explained below, the court will DENY ATCU's motion to strike IBT's motion for

summary judgment (doc. 83); DENY its motion to strike IBT's reply brief (doc. 97); DENY

ATCU's motion to file a third amended complaint (doc. 82), and will GRANT summary judgment

in favor of IBT on all counts.

## I.     FACTUAL BACKGROUND

### *The Construction and Completion of the Building*

On April 17, 2003, Plaintiff Alabama Teachers Credit Union and Design-Build Concepts,

Inc. (a Georgia corporation) entered into a Program Services Agreement for DBC to design and

construct a building for ATCU in Gadsden, Alabama. (Doc. 80-2). The agreement contained two

warranties that began to run the date on which the building's "Certificate of Substantial

Completion" was issued.

More specifically, the one-year warranty provided that "all materials and component parts

used in the construction of the [building] will be free from defects under normal use and service

and all workmanship will be within tolerances normally accepted in the industry. If a defect

---

[1] This court granted Design Build Concepts, Inc.'s motion to dismiss on October 18, 2017, finding the statute of limitations had run on ATCU's claims, and IBT's crossclaims, against the dissolved Georgia corporation. (Doc. 90).

occurs, DBC . . . will repair, replace or pay the Owner the reasonable cost of repairing or replacing the defective item(s)." The four-year warranty provided that "DBC will correct or repair any Major Structural Defects in the [building]," meaning "those defects in the materials or workmanship that reduce the stability, safety, or structural integrity of the [building] below acceptable standards or restrict the normal intended use of all or a part of the [building]." (*Id.* at 3).

ATCU moved into the building in January 2006, and the Certificate of Substantial Completion was issued on March 6, 2006. (Doc. 80-4). However, items remaining to be completed on the February 28, 2006, punch list included roof leaks and water intrusion damage. (Doc. 80-9).

### *IBT's Purchase of DBC's Assets*

On July 31, 2007, IBT purchased substantially all of DBC's assets and assumed some of its liabilities pursuant to an asset purchase agreement—a deal ATCU alleges was a *de facto* merger. (Doc. 25-1). On August 3, 2007, Jim Givan (DBC's president) and Mylle Mangum (CEO of IBT Enterprises) sent a letter to Ron Sumerall (president of ATCU) announcing that DBC had "reached an agreement to merge" with IBT Enterprises. (Doc. 85-5 at 58). The letter assured Mr. Summerall that the DBC team would continue to provide services to ATCU and would work with ATCU as in the past.

Then, on April 25, 2008, Mr. Givan sent Mr. Summerall a second letter, advising him that DBC had "merged capabilities with IBT Enterprises, LLC," had "transferred to Design Build Concepts/IBT, LLC all its assets as of July 31, 2007, and [would] conduct business in that name going forward." (Doc. 85-5 at 59).[2] The letter further stated that IBT would "remain the surviving entity, continuing performance under your [Program Services] Agreement." Last, the letter explained the Program Services Agreement "contemplates [that ATCU's] consent to the transfer

---

[2] The court refers to "Design Build Concepts/IBT, LLC" as simply "IBT" throughout this Memorandum Opinion.

of substantially all of DBC's assets may be required, as such transfer under the Agreement may constitute an assignment." Mr. Summerall signed the letter, DBC's officers and employees continued working for IBT after the asset purchase in the same capacities as before, IBT continued using the "DBC" name on its website, and IBT operated out of DBC's former office. (Doc. 84 at 11, 24).

### Problems Continue with ATCU's Building

Aside from the initial leaks indicated on the February 2006 punch list, ATCU discovered more leaks and subsequent damage within four to six months after moving into the building. (Doc. 85-3 at 17). ATCU notified DBC of the problems, and DBC began making site visits to attempt to repair the defects. (*Id.* at 28). Thus began a long cycle of ATCU experiencing water intrusion damage, and DBC's (and later, IBT's), fruitless assurances and efforts to solve the problems. The record is sparse regarding DBC's and IBT's efforts to repair the building between 2006 and 2010, so ATCU's case centers on the events described below.

IBT's Chief Operating Officer, Mr. Lock, wrote Mr. Summerall on November 30, 2010, acknowledging five years of failed attempts to repair the leaks in ATCU's building. (Doc. 80-15). On December 8, 2010, Mr. Lock notified Mr. Summerall that he planned to obtain a quote from a roofing company to inspect the building's roofing membrane and flashing system, and to make any necessary repairs or adjustments. (Doc. 80-16). His email assured ATCU that IBT would "get to the bottom of the problem and bring this to a final resolution once and for all." (Doc. 80-15). Mr. Lock also told ATCU that if the leaks continued after the repairs or replacement of the membrane, IBT would continue searching for the source of the problem and solve it. (Doc. 85-13).

Approximately two weeks later, Mr. Lock wrote Mr. Summerall again with an update on the status of obtaining quotes to remove and replace the roof pavers and to inspect or replace the

roofing membrane. (Doc. 80-17). He suggested the work would begin at the beginning of 2011. However, as of Mr. Lock's February 24, 2011, email to ATCU, the work still had not been completed. (Doc. 84 at 15–16). The record is unclear as to whether the parties resolved this particular issue, providing only that Mr. Lock followed up on the work on August 25, 2011. (*Id.*).

On September 6, 2011, ATCU notified IBT of a new leak that appeared in the building's foyer. (Doc. 85-18 at 3). IBT responded that it would follow up with its client services manager, Billy Cowan. (*Id.* at 2). Four days later, on September 10, Mr. Cowan notified Mr. Lock that he had scheduled an inspection of the ATCU roof by Fiber-Tite, the roofing manufacturer; GKL Roofing, the original subcontractor that installed the roof and made multiple repairs at IBT's instruction; and Clarks Custom Roofing, whom IBT requested provide pricing for flashing around roof vents. (Doc. 85-19).

On October 31, 2011, Clarks Custom Roofing emailed Mr. Cowan regarding the cost to install drip edge flashing as IBT had requested. (Doc. 85-20). Clarks stated that the building envelope was "badly designed" and the roofing manufacturer, the exterior insulation finishing system ("EIFS") installer, and the roofing installer must have known that the work was unacceptable. Mr. Cowan forwarded the email to his IBT colleagues, but not to anyone at ATCU. (Doc. 85-27 at 3–4). No one at IBT ever revealed this information to ATCU. (Doc. 85-21 at 2–3).

Sometime in 2012, ATCU's loan manager, Mr. Clark, met Mr. Cowan and GKL on-site to discuss various repairs. (Doc. 84 at 18). After that visit, GKL made multiple attempts to repair the building up until sometime in 2015, but no evidence suggests that IBT paid GKL for those visits. IBT alleges that *its* last site visit occurred sometime in 2012, and its final email correspondence with ATCU occurred no later than February 2013. (Doc. 79 at 11). ATCU alleges that IBT made

site visits in February 2013, but the court gleans no evidence supporting that proposition from the emails ATCU submitted. (Docs. 85-23; 85-24).

ATCU alleges GKL's repairs were on behalf of IBT, were according to IBT's instruction, and were an attempt to satisfy IBT's warranty obligations (docs. 84 at 18;85-24; 85-27). However, Randall Lipscomb, a principal of GKL, testified that DBC hired GKL as the original subcontractor to install the roof at the ATCU building, but GKL never acted or represented itself as DBC's or IBT's agent. (Doc. 80-24 at 1). GKL's communications with IBT ceased sometime in 2013, and Mr. Lipscomb did not communicate with any IBT employee or representative after that time. (*Id.* at 2).

After direct communications between IBT and ATCU ceased in 2013, the building continued leaking. (Doc. 79 at 12). In late 2015 or early 2016, ATCU retained a building envelope consultant, Stephen Ward & Associates, to inspect ATCU's building to determine the source of the leaks. (Doc. 85-26 at 2). On July 15, 2016, SWA issued a report of its findings and recommendations, which revealed latent defects in the building of which ATCU was unaware. (Doc. 85-25). The report identified, among other defects, a bad EIFS membrane assembly design within the building's walls. The defects were products of the initial design and DBC's construction, so SWA would have discovered them if ATCU had hired the company back in 2007. (Doc. 80-5 at 30). ATCU sent the report to IBT on August 24, 2016, and requested that IBT inspect the building to develop a plan of action to address the defects and to correct the problems that IBT had repeatedly failed to properly repair. IBT did not respond.

### *ATCU Files Suit*

ATCU filed suit against DBC and IBT in the Circuit Court of Etowah County on November 10, 2016, (doc. 1-1 at 6), and Defendants removed the case to this court on December

16, 2016. (Docs. 1-1 at 6; 1). As previously noted, this court dismissed all claims and crossclaims against DBC. Only ATCU's claims against IBT remain, which include breach of contract; negligence; fraudulent misrepresentation; breach of warranty; negligent hiring, training, and supervision; professional negligence; and negligent performance of warranty obligation.

## II.     STANDARD OF REVIEW

Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment, it must determine two things: whether any genuine issues of material fact exist, and whether the moving party is entitled to judgment as a matter of law. *Id.*

The court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the non-moving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must not weigh the evidence and making credibility determinations because these decisions belong to a jury. *See id.* at 254.

Further, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). However, the nonmoving party "need not be given the benefit of every inference but only of every *reasonable* inference." *Id.* (emphasis added).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

After both parties have addressed the motion for summary judgment, the court must grant the motion *only if* no genuine issues of material fact exist *and* the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.

## III. DISCUSSION

On June 20, 2017, ATCU and IBT submitted a "Joint Plan for Initial Limited Discovery," which the court adopted in its Order dated June 26, 2017. (Docs. 56, 59). Pursuant to that Order, the parties were to engage in limited discovery "on issues related to Defendant's affirmative defenses (specifically that the claims are time barred) and to the Asset Purchase Agreement" between IBT and DBC. The plan also provided that, following the period of limited discovery, IBT would file a motion for summary judgment "on its affirmative defenses." After IBT moved for summary judgment, ATCU filed a motion to strike the motion, or in the alternative, for leave to conduct additional discovery needed to respond appropriately. (Doc. 83).

As an initial matter, the court will DENY ATCU's motion to strike (doc. 83) because it finds IBT's briefs in support of its motion for summary judgment adequately comply with the Joint Plan. The court is capable of disregarding IBT's arguments to the extent they exceed the plan. Therefore, the court clarifies that its decision in this Memorandum Opinion is based solely on the issues of 1) IBT's affirmative defenses; and 2) successor liability, if any, arising out of its asset purchase agreement with DBC.

In essence, ATCU claims that DBC breached the two companies' Program Services Agreement by failing to properly construct the building; that DBC and IBT breached the Program Services Agreement's warranty provisions by failing to effectively repair the building's defects; that DBC negligently constructed the building; that DBC and IBT were negligent in their attempts to repair the building; and that DBC and IBT fraudulently misrepresented that they would

complete or had already completed the required repairs. Again, ATCU asserts that IBT is liable for its own conduct, as well as DBC's, pursuant to the doctrine of successor liability.

As for its affirmative defenses, IBT contends that each of ATCU's claims is untimely—barred either by Alabama's statute of limitations or statute of repose. In response, ATCU argues that IBT should be equitably estopped from asserting the statute of limitations, and the statute of repose does not bar its claims. ATCU further argues that its claims for negligence, breach of contract, and breach of warranty arising out of the defects discovered in 2016 are not untimely because those defects were latent and, consequently, the limitations period regarding those claims did not begin to run until their discovery.

As explained below, the question of successor liability significantly affects the other issues in this case, such as the applicable statute of limitations and repose. Therefore, the court will first address that question, followed by an analysis of IBT's affirmative defenses and ATCU's arguments against the applicability of those defenses. Last, the court addresses ATCU's motion seeking leave to amend its complaint.

### A. Whether IBT may be held liable for DBC's conduct (Successor Liability)

ATCU argues that IBT bears liability for DBC's conduct under three exceptions to the general rule of successor non-liability. IBT disagrees, and argues that IBT's purchase of DBC was an asset purchase, which legally shields IBT from successor liability. The parties also disagree as to whether Alabama or Georgia law governs the successor liability issue. Therefore, the court will first address the choice of law question, then apply the appropriate law to the facts to determine whether ATCU may hold IBT liable for DBC's conduct.

IBT maintains that Georgia law governs the question of successor liability because its asset purchase agreement with DBC provides that Georgia law governs the agreement's validity and

interpretation. ATCU, on the other hand, focuses on exceptions to the general rule of successor non-liability, and provides Alabama case law showing that a purchaser may be liable for its successor's conduct even when the purchase is legally styled as an asset purchase agreement. Thus, ATCU argues that even if IBT's purchase of DBC constitutes an asset purchase agreement under Georgia law, ATCU may still hold IBT liable for DBC's conduct under Alabama law—so long as certain factors are present.

A federal court sitting in diversity applies the conflict-of-laws rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Therefore, this court must apply Alabama's choice of law rules regarding whether, and under what circumstances, IBT may be held liable for DBC's conduct under the doctrine of successor liability.

To begin, the court notes that Alabama honors choice of law provisions within valid contracts. *See Cherry, Bekaert & Holland v. Brown*, 582 So. 2d 502, 507 (Ala. 1991). Because the asset purchase agreement between IBT and DBC so provides, the court agrees with IBT that Georgia law governs any issues concerning the validity and interpretation of that agreement. However, that finding does not dictate that Georgia law exclusively governs the question of successor liability.

In Alabama, the same state's law that governs the plaintiff's claims against the defendant also governs the question of whether a successor entity may be held liable for its predecessor's conduct—even if the actual business deal between the successor and predecessor is governed by the law of another state. *See Am. Nonwovens, Inc. v. Non Wovens Eng'g, S.R.L.*, 648 So. 2d 565, 567–70 (Ala. 1994). Here, the parties do not dispute that Alabama law governs ATCU's claims against IBT because they arise out of DBC's building contract with ATCU—not out of IBT's purchase agreement with DBC. Therefore, while Georgia law governs the contract by which IBT

purchased DBC's assets, "Alabama law governs the question of whether" IBT may be held liable as DBC's successor. *Id.* at 570.

Alabama law provides scenarios in which Alabama courts should look beyond the form of a purchase agreement and impute the seller's liability to the purchaser. And because ATCU relies on those scenarios to establish successor liability, the court does not need to interpret the asset purchase agreement or make any determination regarding its validity. The court can assume as true IBT's assertion that, under Georgia law, the contract is an asset purchase agreement rather than a merger.

However, the court must determine whether the facts in this case would lead an Alabama court to impute DBC's liability to IBT despite the fact that its purchase of DBC was an asset purchase rather than a merger. Under Alabama law,

"where one company sells or otherwise transfers all its assets to another company, the transferee is not liable for the debts and liabilities of the transferor unless (1) there is an express agreement to assume the obligations of the transferor, (2) the transaction amounts to a *de facto* merger or consolidation of the two companies, (3) the transaction is a fraudulent attempt to escape liability, or (4) the transferee corporation is a mere continuation of the transferor." *Prattville Memorial Chapel v. Parker*, 10 So. 3d 546, 555 (Ala. 2008) (internal quotations omitted).

ATCU argues that IBT is liable for DBC's debts and liabilities because three of these four exceptions apply to IBT's relationship with DBC. As shown below, the court finds that IBT expressly assumed DBC's warranty obligations in existence at the time of the Asset Purchase Agreement. It also finds that IBT is a mere continuation of DBC. The court makes no determination regarding the other two exceptions because the parties only provided New York and Georgia case law regarding the de facto merger theory, and ATCU did not submit any argument

11

for the fraud-based exception.

### *An express agreement*

IBC and DBC executed an asset purchase agreement on July 31, 2007, by which IBT acquired DBC's assets, some of its liabilities, and its goodwill. (Doc. 84 at 10). IBT expressly assumed the liabilities laid out in the asset purchase agreement's "Section 1.2 Assumed Liabilities," which include "(A) accounts payable and accrued expenses . . . " and "(B) obligations for warranty or repair work for services provided by DBC to customers of the Business prior to the Effective Date." (Doc. 25-1 at 2–3).

So, the court finds that IBT did assume DBC's obligations for warranty and repair work that DBC was contractually bound to perform at the time the asset purchase agreement was executed.[3] That assumption of liability would allow ATCU to hold IBT liable for failure to meet warranty and repair obligations in effect at the time IBT and DBC executed the asset purchase agreement.

### *Continuation of the transferor*

A second exception to the rule that a transferee corporation generally is not liable for the liabilities of the transferor is if "the transferee corporation is a mere continuation of the transferor." *Prattville Memorial Chapel*, 10 So. 3d at 555. The Supreme Court of Alabama has established that a purchasing corporation is a mere continuation of the selling corporation if

> (1) There was basic continuity of the enterprise of the seller corporation, including, apparently, a retention of key personnel, assets, general business operations and even the [seller's] name;
> (2) The seller corporation ceased ordinary business operations, liquidated, and

---

[3]Such provisions are valid under both Alabama law (the law the court applies that prompts the question of whether an express agreement exists) and Georgia law (the law that governs the validity of that express agreement). *See Prattville Memorial Chapel v. Parker*, 10 So. 3d 546, 555 (Ala. 2008); *Gwinnett Hosp. Sys., Inc. v. Massey*, 469 S.E. 2d 729, 730 (Ga. Ct. App. 1996).

dissolved soon after distribution of consideration received from the buying corporation;

(3) The purchasing corporation assumed those liabilities and obligations of the seller ordinarily necessary for the continuation of the normal business operations of the seller corporation; and

(4) The purchasing corporation held itself out to the world as the effective continuation of the seller corporation.

*Id.* at 555–56 (quoting *Turner v. Wean United, Inc.*, 531 So. 2d 827, 830 (Ala. 1988) (internal quotation marks omitted) (alteration in original)).

For this "mere continuation" exception to apply, the plaintiff must establish each of the four factors with substantial evidence. *Id.* at 557. The court now turns to the evidence ATCU submitted in support of each factor.

### (1) Basic continuity of enterprise

In support of the first factor, ATCU provides that, after executing the asset purchase agreement, DBC's officers and employees continued working for IBT; IBT operated out of the same office as DBC; IBT purchased all of DBC's assets; and, as of February 20, 2017, IBT still held itself out to the public as "Design Build Concepts" on its website (doc. 85-8). IBT does not dispute any of these facts, and the court finds they tend to show a continuity of the enterprise.

### (2) Cessation of operations and dissolution

The second factor requires ATCU to show that DBC "ceased ordinary business operations, liquidated, and dissolved soon after distribution of consideration received from the buying corporation." *Prattville Memorial Chapel*, 10 So. 3d at 555. To do so, ATCU argues that although the official dissolution of DBC did not occur until 2010 (doc. 43-11 at 6), DBC's cessation of business after IBT's purchase of its assets in July 2007, resulted in a *de facto* dissolution—thereby satisfying the second factor's requirement that the plaintiff show that the dissolution occurred "soon after" receiving consideration from the purchasing company.

13

While the delay between the date of the asset purchase and DBC's formal dissolution could suggest that the dissolution was not "soon" after the purchase, ATCU has shown that DBC discontinued doing business almost immediately after the purchase agreement. The agreement itself recognizes that DBC was selling all its assets and liabilities, which included preexisting contracts and accounts. The asset purchase left DBC without assets, revenue, employees, office, or any business operations. Thus, for all practical purposes, DBC no longer existed upon the selling of its business to IBT. Therefore, the court agrees that this factor weighs in favor of finding that IBT is a mere continuation of DBC.

### (3) Assumption of liabilities and obligations necessary for continuation of seller's normal business operations

Along with all of DBC's assets, IBT assumed DBC's warranty and repair obligations it was bound to perform for its preexisting customers, as well as DBC's accounts payable and accrued expenses. (Doc. 25-1 at 2–3). Therefore, the court finds IBT "assumed those liabilities and obligations of the seller ordinarily necessary for the continuation of the normal business operations of the seller corporation;" this factor weighs in favor of finding that IBT is a continuation of DBC. *See Parker*, 10 So. 3d at 556.

### (4) Whether IBT held itself out as the effective continuation of DBC

In support of the fourth factor, that IBT held itself out to the world that it was the effective continuation of DBC, ATCU provides that IBT continued using the "Design Build Concepts" name and logo long after the asset purchase. For example, as of February 2017, IBT was still using DBC's name on its website. *See, e.g. Turner v. Wean United, Inc.,* 531 So. 2d 827, 831–32 (Ala. 1988) (finding purchaser did not hold itself out as the same company because it did not attempt to avail itself of the benefit of the old company name).

Also, Jim Givan, President and CEO of DBC, wrote to ATCU on April 25, 2008, notifying ATCU that DBC had transferred to IBT all its assets. (Doc. 85-6). Mr. Givan wrote that he was "excited about this *merger*, as it will allow us to offer clients a more complete package of design/build, consulting and training services," and that he was "enthusiastic about our future operations and continued relationship with [ATCU]." (Emphasis added). Given IBT's continued use of the DBC name and Mr. Givan's representations to ATCU, the court finds this fourth factor also weighs in favor of finding that IBT is a continuation of DBC.

While ATCU has presented substantial evidence of each of the four factors required to show that IBT is a mere continuation of DBC, IBT has offered nothing to contest that evidence. Rather, it only argued that the court cannot find its purchase of DBC was a *de facto* merger under Georgia law. However, IBT's argument misses the mark on two fronts.

First, as already explained, Alabama courts apply Alabama law to determine whether an exception to successor non-liability applies. *See Am. Nonwovens, Inc. v. Non Wovens Eng'g, S.R.L.*, 648 So. 2d 565, 567 (Ala. 1994). So, whether the asset purchase agreement would constitute a *de facto* merger under Georgia law is irrelevant. Second, the *de facto* merger theory is only one of four means of establishing successor liability. Even if the agreement did not constitute a *de facto* merger, IBT may still be held liable if any of the other three exceptions apply.

ATCU presented substantial evidence that convinces this court that IBT is the continuation of DBC under Alabama law. In light of such evidence—and IBT's failure to dispute that evidence—the court finds that IBT may be held liable for DBC's alleged breaches of contract and tortious conduct as DBC's successor.

**B. Which Alabama Statute of Limitations Controls**

IBT argues that each of ATCU's claims in this case is untimely under Alabama law.

15

Because this court sits in diversity, and because the claims arise out of a contract made in Alabama, Alabama substantive law, including the statute of limitations, governs these proceedings. *See Mississippi Valley Title Ins. Co. v. Thompson*, 802 F.3d 1248, 1251 n.2 (11th Cir. 2015). However, under Alabama law, not only do the limitations periods for claims arising in tort, contract, and fraud vary, *see* Ala. Code § 6-2-30 *et seq.*, the Code of Alabama also provides special limitations periods for certain claims brought against licensed general contractors. *See* Ala. Code § 6-5-220 *et seq*. Therefore, the court must determine which Alabama statute controls the limitations period for each of ATCU's claims.

Generally, Alabama law provides that the limitations period for breach of contract claims is six years, and the limitations period commences when the contract is breached. *AC, Inc. v. Baker*, 622 So. 2d 331, 333 (Ala. 1993) (citing Ala. Code § 6-2-34(9)). Negligence claims have a limitations period of only two years, which commences the date the injury occurs. Ala. Code § 6-2-38(l); *Henson v. Celtic Life Ins. Co.*, 621 So. 2d 1268, 1274 (Ala. 1993). Finally, the statute of limitations for fraudulent misrepresentation is also two years, Ala. Code § 6-2-38(l), but begins to run "when the plaintiff was privy to facts which would 'provoke inquiry in the mind of [a person] of reasonable prudence, and which, if followed up, would have led to the discovery of the fraud.'" *Auto-Owners Ins. Co. v. Abston*, 822 So. 2d 1187, 1195 (Ala. 2001) (quoting *Willcutt v. Union Oil Co.*, 432 So. 2d 1217, 1219 (Ala. 1983)).

But, the Alabama Code provides a different limitations period for all claims brought against a "builder," as the Code defines that term. Section 6-5-221(a) provides,

> [a]ll civil actions in tort, contract, or otherwise against…builders who constructed, or performed or managed the construction of, an improvement on or to real property designed by and constructed under the supervision, administration, or observation of an architect or engineer, or designed by and constructed in accordance with the plans and specifications prepared by an architect or engineer,

for the recovery of damages…shall be commenced within two years next after a cause of action accrues or arises, and not thereafter.

Given the different limitations periods for claims against "builders," this court must determine whether IBT satisfies the statute's definition of that term. Section 6-5-220(a) defines "builder" as "[a]ny individual, partnership, firm, or corporation that constructed, or performed or managed the construction of, an improvement, or any portion thereof, on or to real estate, and at the time of the construction was licensed as a general contractor in the State of Alabama."

Both parties agree that IBT does not fit § 6-5-220(a)'s definition of "builder" because IBT never performed or managed the construction of ATCU's building—that all occurred before IBT purchase DBC's assets. But the parties disagree as to whether the statute's definition *encompasses* a "builder's" transferee who may be held liable for the builder's conduct. While ATCU argues in favor of a narrow interpretation of the statute, IBT argues that the legislature intended the statute to apply to claims against builders' successors in liability.

IBT contends that the Supreme Court of Alabama's decision in the *Housing Authority of the City of Huntsville v. Hartford Accounting & Indemnification Co.,* 954 So. 2d 577 (Ala. 2006) controls. In *Hartford*, the court addressed the question of whether a builder's *surety* may assert the special two-year statute of limitations defense found in § 6-5-221 despite the fact that the surety was not itself an "architect, engineer, or builder." The court's rationale for concluding that the surety could assert the defense is telling, and this court finds it applicable here.

To begin, the court in *Hartford* noted that "while it appears that the two-year limitations period does not expressly apply to a surety, the statute does not limit the application of any existing common-law doctrine." *Hartford*, 954 So. 2d at 582. The court based this proposition on § 6-5-228, which states that "[n]othing contained in this article shall be construed as affecting any

period of limitation for any cause of action . . . against any person other than architects, engineers and builders as defined in this article."

Next, the court acknowledged that statutory interpretation "begins with the plain language of the statute itself," and noted that § 6-5-220 *et seq.* does not mention the common-law doctrine allowing sureties to assert the defenses available to their principals. *Id.* Thus, the court reasoned, because that common law principal existed at the time the Alabama legislature enacted § 6-5-221, the legislature's choice not to expressly address the doctrine suggests that it did not intend for the statute to limit the doctrine. *Id.*

Therefore, the Supreme Court of Alabama concluded that the statute's plain language does not "compel the conclusion that the legislature . . . expressly limited the common-law doctrine that allows a surety to assert the defenses that are available to its principal." *Id.* The court continued:

> On its face, the statute applies only to "architects, engineers and builders," and it expressly states that all other periods of limitation for any cause of action against any other party are unaffected by the statute….[T]he statute simply does not apply to [Defendant], who is a surety and not an architect, engineer, or builder. The statute neither expands nor limits defenses available to [Defendant]; instead, it has no effect on [Defendant] at all. If, under the common law, a surety may assert the statute of limitations available to its principal, then according to § 6-5-228, that common-law rule is unaffected by § 6-5-221. Therefore, [Defendant] may assert the limitations period available to its principal, whatever that period may be….To hold that § 6-5-221 does not allow [Defendant] to assert a statute-of-limitations defense that is available to its principal…would be to do exactly the opposite of what § 6-5-228 commands, because such a construction …would directly affect a period of limitation for a cause of action against a person other than an architect, engineer, or builder.

*Id.*

This court disagrees with ATCU's assertion that *Hartford* is limited to the situation in which a surety seeks to assert defenses available to its principal. The Supreme Court of Alabama's rationale is clear: according to § 6-5-228, a defendant capable of asserting an architect's,

engineer's, or a builder's statute of limitations defense under the common law may assert that defense even if the defendant itself does not fall within the categories of persons to which § 6-5-221 applies.

The court interpreted the statute's silence regarding the common-law doctrine allowing a surety to assert the defenses available to its principal as indicating the legislature's intent to leave that common-law rule unaffected. In fact, the court interpreted § 6-5-228 to function as a protection against the elimination of such common-law rules. The court did not explicitly or implicitly limit its holding to cases involving sureties. And, following the court's rationale to its logical end, this court concludes that § 6-5-221 does not negate other common-law rules in effect at the time the statute was written that allow certain defendants to assert the defenses of those with whom they are in privity.

Now, applying the court's holding in *Hartford* to the present case, this court asks whether, under Alabama common law, a defendant who is assigned successor liability may assert its predecessor's defenses. The answer to that question is yes. For example, in *Rivers v. Stihl, Inc.*, 434 So. 2d 766, 773 (Ala. 1983), the Supreme Court of Alabama recognized that a successor in interest could assert its predecessor's assumption-of-the-risk defense against the plaintiff's claims. This theory is logical, and logically applies in the present case.

In *Clardy v. Sanders*, 551 So. 2d 1057, 1061 (Ala. 1989), the Supreme Court of Alabama explained that the very reason the de facto merger and mere continuation theories exist to allow for successor liability is because the successor organization is essentially the same entity as the predecessor that caused the injury. Therefore, because they are treated as the same entity for purposes of liability, it stands to reason that successors in interest must be capable of asserting their predecessors' affirmative defenses. To allow successor liability while prohibiting affirmative

19

defenses would lead to undesirable results.

The present case is a perfect example. Stripping a successor's access to its predecessor's affirmative defenses would include eliminating the statute-of-limitations defense, a defense the Alabama legislature intentionally created for public policy reasons. *See, e.g., Cline v. Ashland, Inc.*, 970 So. 2d 755 (Ala. 2007) (recognizing the legislature's choosing the harsh results of barring untimely claims over the harsh results of old and stale cases). This result would also be illogical: a plaintiff's claims against an entity could lie dormant for decades past the limitations period, and then be inexplicably resurrected upon the tortfeasor's sale of the company (so long as the plaintiff convinced the court of successor liability). Such a scenario would be entirely unreasonable and defeat the purpose behind having a statute of limitations in the first place.

Therefore, this court is convinced of the following: 1) Alabama common law allows a successor in liability to assert its predecessor's affirmative defenses, including the statute of limitations and repose; 2) that this common law rule dates at least as far back as the Supreme Court of Alabama's 1983 ruling in *Rivers v. Stihl, Inc.*, 434 So. 2d 766 (Ala. 1983); and 3) because the Alabama legislature did not enact § 6-5-221 until 1994, *see Mitchell v. Richmond*, 754 So. 2d 627, 629 (Ala. 1999), the common law rule allowing successors in liability to assert their predecessor's affirmative defenses existed when § 6-5-221 was enacted and was not affected by it.

Therefore, given the Supreme Court of Alabama's conclusion that Ala. Code § 6-5-228 protects against the elimination of such common-law rules existing at the time § 6-5-221 was enacted, this court finds that IBT may assert DBC's statute-of-limitations defense, even though IBT is not a "builder" under the statute's definition of the term. Consequently, because IBT is a mere continuation of DBC under Alabama law, the two-year statute of limitations within Ala. Code § 6-5-221 governs all ATCU's claims against IBT that specifically arise under the theory of

20

successor liability.

**C. Whether ATCU's claims are untimely under Ala. Code § 6-5-220 *et seq.***

For ATCU's claims arising under successor liability to be timely under Ala. Code § 6-5-221(a), ATCU must have filed them within two years after the causes of action accrued. Importantly, the statute provides that the accrual date depends on whether the damage is latent. The cause of action generally "accrues or arises" when the injury or property damage occurs; but in cases where the injury or damage is either "latent or by its nature is not discoverable in the exercise of reasonable diligence at the time of its occurrence," the claim is deemed to arise or accrue "at the time the damage or injury is or in the exercise of reasonable diligence should have been first discovered, whichever is earlier." § 6-5-221(e). The statute further provides that the claim arises or accrues "whether or not the full amount of damages is apparent at the time of the first . . . damage, and cannot be extended as a continuous wrong." *Id.*

Thus, § 6-5-221(e) applies the "discovery rule" in construction cases where the injury or damage is latent. *Dickinson v. Land Developers Const. Co.*, 882 So. 2d 291, 298 (Ala. 2003). Therefore, this court must determine the accrual date of each of ATCU's claims involving latent damage against IBT that arises under successor liability according to the discovery rule. The rule also applies to ATCU's fraudulent misrepresentation claim. *See* Ala. Code § 6-2-3.

ATCU's claims against IBT within Counts I, II, V, VI, and VII exclusively rely on the doctrine of successor liability because they seek damages from IBT based on DBC's actions or omissions before the asset purchase took place. Therefore, the two-year statute

of limitations in Ala. Code § 6-5-221 governs the timeliness of each of those claims. While ATCU's claims in Counts III, IV, and VIII likewise seek to hold IBT liable for DBC's actions, the claims also seek to hold IBT liable for its own conduct. Therefore, the court will address the claims in those counts in Part "D."

### Counts I, II, V, VI, and VII

In Count I of ATCU's Second Amended Complaint, ATCU alleges IBT bears liability for DBC's breach of its contractual agreement to construct the building in a good, sound, workmanlike, and professional manner, and to construct a building free from defects. (Doc. 40 at 3). Count II seeks to hold IBT liable for DBC's negligent construction, management, and supervision of its employees' and subcontractors' work on the building. (*Id.* at 6). Count V alleges IBT is liable for DBC's negligent hiring, training, and supervision of its employees and subcontractors regarding the design and construction of the building. (*Id.* at 13). In Count VI, ATCU claims IBT is liable for DBC's breach of its contractual obligation to properly design the building to ensure adequate waterproofing and to properly coordinate, administer, and inspect the work on the building to ensure conformity with the design documents. (*Id.* at 15). And Count VII alleges that IBT is liable for DBC's professional negligence for breaching its duty to provide architectural and related services in compliance with professional industry standards. (*Id.* at 16).[4]

Thus, all the breach of contract and tort claims within Counts I, II, V, VI, and VII arise from DBC's alleged failure to construct and deliver to ATCU the type of building for which it had

---

[4]Although ATCU asserts some of the claims within Counts I, II, V, VI, and VII against DBC and IBT, the court treats those claims against IBT as successor liability claims because each of those claims arises either out of DBC's contract with ATCU, or DBC's construction of the building, which was completed before IBT's asset purchase agreement with DBC.

contracted.[5] And, all the claims arise out of the building's insufficient waterproofing. But, ATCU's "punch list" from February 2006 includes notations of roof leaks and water intrusion damage, and ATCU admits that it continued noticing more water intrusion problems during the first half of 2006 (four to six months after moving into the building).

ATCU notified DBC of the leaks, and DBC investigated and made unsuccessful attempts to repair the leaky building on numerous occasions. (Doc. 84 at 9–10). Therefore, the water leaks and the resulting damage were by no means latent, unnoticed, or hidden. ATCU was well aware of the building's water intrusion problems more than ten years before filing this lawsuit in November 2016. To the extent the claims in Counts I, II, V, VI, and VII arise out of those defects, damages, and injuries of which ATCU was so well aware, the discovery rule does not apply; the claims accrued well before November 10, 2014, and those claims are untimely under § 6-5-221's two-year limitations period. *See Dickinson v. Land Developers Const. Co.*, 882 So. 2d 291, 299 (Ala. 2003) (holding the discovery rule did not apply where plaintiffs discovered a number of overt problems with their home, which should have led them to the source of the problems, more than two years before filing suit).

### Latent Defects

To argue the defects were latent, ATCU presented Mr. Summerall's deposition testimony, which provides that some defects in the building were undiscovered until Stephen Ward & Associates, Inc. investigated the source of the leaks in July 2016 (doc. 85-25 at 6). ATCU argues that these defects were latent, the discovery rule applies, and the statute of limitations for its claims

---

[5] As previously explained, each of these claims would normally carry different limitations periods, but the court finds that IBT may assert DBC's on ATCU's claims arising under successor liability, so Ala. Code Ala. Code § 6-5-221's two-year limitation period applies.

for negligence, breach of contract, and breach of warranty related to these latent defects did not begin to run until ATCU discovered these deficiencies in 2016.

To support this argument, ATCU relies on *Dickinson v. Land Developers Const. Co.*, 882 So. 2d 291 (2003). In *Dickinson*, the defendant builder entered into a contract with the plaintiff homeowners for the construction of their home. The plaintiffs moved into the home in 1993. Between that time and 1995, the Dickinsons discovered broken seals on windows, problems with French doors, a leak in the "pool bath," cracks in the driveway, and a water leak under the driveway. *Id.* at 295. The plaintiffs sent the defendant builder a punch list of those items several months after moving into the home, and three more letters in the months and years following. The builder never responded at all.

Eventually, in 1999, the Dickinsons hired a structural engineer who discovered a separation between the brick veneer and the doorframes of the doors at the rear of the home, which he determined were caused by the rotting of a belowground basement wall. The engineer also found the driveway and other concrete surfaces were cracking because the builder constructed them on fill soils. The Dickinsons filed suit against the builder that same year.

The trial court in *Dickinson* applied Ala. Code § 6-5-221, found that the damage to the home had occurred more than two years before the Dickinsons filed suit, and entered summary judgment for the builder. The court held that the plaintiffs either discovered all the home's defects, "or were privy to facts that would provoke inquiry in a [person] of reasonable prudence, and which, if followed up, would have led to the discovery of all the defects more than two years before they filed their complaint." *Dickinson*, 882 So. 2d at 299 (internal quotations omitted).

The Supreme Court of Alabama agreed with the trial court that the Dickinsons' claims arising out of the home's defects regarding the window seals, "pool bath," cracked driveway, and

leak underneath the driveway were untimely because the Dickinsons had discovered those issues more than two years before filing suit. While the Dickinsons did not necessarily know the exact source of those problems, the problems were quite evident. Thus, the discovery rule did not apply to those claims, and they accrued the moment the damage occurred.

But, the court disagreed with the defendant builder that *all* the Dickinsons' claims were untimely. The court reasoned that the Dickinsons' knowledge of the defects listed above was insufficient, as a matter of law, to provoke a reasonable person to inquire and discover within the limitations period that their home was partially resting on an underground, rotten wooden wall, or that their concrete surfaces were constructed on improperly compacted fill soils. More specifically, the court stated:

> [T]he issue is not whether the [plaintiffs] had general knowledge of problems with the construction of the house or whether a reasonable person would have sought professional help in an attempt to discover the source of the problems and fix them….Instead, the issue is whether [the builder] has produced sufficient evidence on which to hold *as a matter of law* that the problems…with the [plaintiffs'] house, of which the [plaintiffs] were aware shortly after the house was constructed, would have put a reasonable person…on notice that he should have 1) investigated the underground wooden wall and the fill-soil area *himself*, or 2) gone beyond seeking [the builder's] assistance in determining the source or sources of the problems and the proper way to fix those problems.

*Dickinson*, 882 So. 2d at 299–300 (emphasis in original).

In finding that the defendant builder had not produced sufficient evidence to hold, as a matter of law, that the Dickinsons should have been put on notice as to the rotten wall or the improperly compacted fill soils, the court found that a reasonable person in the Dickinsons' position would not have had the "inclination or ability to perform a sufficient self-investigation" of the wall or fill soil. The court opined that a reasonable person could have believed any number of

issues could have caused the problems the Dickinsons were experiencing, and the Dickinsons attempted to solve the problems through the builder.

Thus, the court in *Dickinson* differentiated between two sets of defects with the plaintiffs' home: the first set included those defects the homeowners discovered during the first two years they lived in the house, and the second set included the rotten sub-grade wooden wall and the improperly compacted fill soils that the homeowners discovered four or five years later. The court affirmed the trial court's holding that the claims arising from the first set of defects were untimely as a matter of law. But the court reversed the trial court's decision regarding the second set of defects because those defects were latent—the builder had not shown that the plaintiffs had discovered them, or reasonably should have discovered them, before the plaintiffs' structural engineer inspected the home.

In the present case, ATCU also argues two different groups of defects—those that occurred from the time it first occupied the building in 2006, and those allegedly latent defects that Stephen Ward & Associates discovered in 2016. Among the allegedly latent defects, ATCU includes the following: absence of a vapor barrier and the required drainage in the EIFS assembly; improper installation of the EIFS directly onto the OSB wall sheathing; and unsealed, missing, and improperly installed flashing. Mr. Summerall testified that all these conditions were separate and different from those that DBC and IBT had attempted to repair. (Doc. 85-3 at 31). Ultimately, ATCU argues that it should not reasonably be expected to have discovered these defects because it relied on DBC and IBT to diagnose and repair the building.

Because the court in *Dickinson* differentiated between the defects the Dickinsons discovered soon after moving into the home, and those they discovered only with the help of a structural engineer, this court must question whether the defects in this case require such a

26

differentiation. In making its determination, the court in *Dickinson* noted that no reasonable person would know that the below-grade wooden wall in the Dickinsons' home was a problem at all; the Dickinsons had no reason to look underground for a piece of rotten wood or improperly compacted fill soils that might be causing the problems with their window seals, French doors, leak in the "pool bath," leak under the driveway, and cracked sidewalk. Only when the engineer found the serious structural damage to their home did they discover the rotten belowground wall and the improperly compacted fill soil. In other words, no obvious connection existed between the latent structural problems and the problems the Dickinsons had discovered years before.

Unlike the latent defects in *Dickinson*, the defects that SWA found in this case were totally intertwined with ATCU's water intrusion problems. Nothing in *Dickinson* overtly linked the defects the homeowners found in the early stages of living in the home to the rotten belowground wall or improperly compacted fill dirt. But here, ATCU's decade-long water intrusion problem was directly linked to the very defects that SWA found. If a newly constructed roof and walls continue to leak, a reasonable person would conclude a problem exists with their materials, design, or construction.

In *Dickinson*, the Supreme Court of Alabama stated that a reasonable person would not pay to have a third party fix and diagnose problems with their house *without first allowing their expert homebuilder to perform that duty—a duty that the homebuilder is generally required to perform."* *Dickinson*, 882 So. 2d at 301. While true, this statement is inapplicable in this case. Unlike the builder in *Dickinson*, DBC and IBT *did* try to diagnose and repair the building—many times. And their contractual duty to do so eventually ended upon the expiration of their warranty agreements.

Although a reasonable person may not *initially* pay for a third party to diagnose the building's problems, a reasonable person certainly would take an alternative course of action

before allowing ten years to pass without any significant progress. ATCU hinted at the argument that IBT modified or extended the initial warranty agreements by continuing to make repair attempts on the building after the original express warranties expired. But, ATCU produced no evidence or legal theory to support such an argument. So, the court finds no basis for concluding that IBT's repair attempts have any effect on the reasonableness of ATCU's delay in hiring a third party to investigate the leaks.

ATCU waited ten years from the first time it discovered water intrusion, nine years after IBT purchased DBC, six years after its four-year warranty expired, and six years after DBC dissolved before hiring a third party to investigate the building's water intrusion problems. The defects were not new; Mr. Summerall acknowledged that SWA would have found the same defects had they investigated back in 2007 (doc. 85-3 at 32). Unlike the latent defects in *Dickinson*, the allegedly latent defects in this case were directly connected to the problems that ATCU had discovered ten years before filing this suit.

Therefore, this court concludes that ATCU discovered or reasonably should have discovered the allegedly latent defects well before SWA's investigation. Thus, the claims arising from the defects that SWA found in 2016 accrued when the damage occurred, which was well before November 10, 2014. Any claims arising from the so-called latent defects are untimely as a matter of law. Consequently, all ATCU's claims within Counts I, II, V, VI, and VII are untimely, and IBT is entitled to summary judgment as to each of them.

### D. Whether ATCU's claims against IBT in Counts III, IV, and VIII are untimely

While Counts I, II, V, VI, and VII are claims for which ATCU seeks to hold IBT liable for only DBC's alleged misconduct, Counts III, IV, and VIII contain claims arising

out of both DBC's and IBT's alleged misconduct. So, Alabama Code § 6-5-221 governs

ATCU's claims within those counts based on successor liability, while § 6-2-34(9) and §

6-2-38(l) govern those claims directly against IBT.

Alabama Code § 6-2-34(9) provides a six-year limitations period for ATCU's

breach of warranty claims directly against IBT, and § 6-2-38(l) provides a two-year

limitations period for ATCU's claims directly against IBT for fraud and negligent failure to

perform warranty obligations. The court now addresses each of these claims with the

appropriate statute of limitations in mind.

### Count III

ATCU alleges in Count III that DBC and IBT breached "express and verbal" warranties

that the building would be free from defects, and that DBC and IBT would make any required

repairs. DBC's Program Services Agreement with ATCU provided two express warranties: 1) a

one-year warranty that DBC would use quality materials and component parts free from defects

and quality workmanship in the construction of the building, and that DBC would make necessary

repairs of defective items; and 2) a four-year warranty protecting major structural defects in the

building that "reduce the stability, safety, or structural integrity of the building." (Doc. 79 at 5–6).

The warranty periods began running upon the issuance of the Certificate of Substantial

Completion, which was issued on March 6, 2006. Therefore, the one-year warranty expired on

March 6, 2007, and the four-year warranty expired on March 6, 2010. Consequently, the latest date

on which DBC or IBT could have breached an express warranty is March 6, 2010.

The statute of limitations for a breach of contract claim, including an express contractual

warranty, is six years. Ala. Code § 6-2-34(9). Even if IBT's failure to make the repairs required by

the agreement's warranty provisions did constitute a breach of warranty, ATCU was continuously

aware of that breach from the time IBT first began making unsuccessful repair attempts back in 2008. Therefore, latency is not an issue. And because more than six years passed between March 6, 2010 (the last possible date on which a breach could have occurred), and November 10, 2016 (the date ATCU filed suit), § 6-2-34(9) bars ATCU's breach of warranty claims as a matter of law. Alabama Code § 6-5-221 places an even shorter statute of limitations of two years on any claim that IBT is liable for DBC's breach of warranty. Therefore, any claim based on successor liability would also be untimely.

ATCU appears to argue that DBC or IBT created additional warranties by promising and attempting to repair the building after the express warranties expired, but submitted no evidence or legal authority supporting that theory. ATCU presented no authority that such assurances constitute legally binding warranties, or any evidence that IBT received any type of consideration in exchange for such assurances. Thus, the court can only consider IBT's alleged assurances as *illusory*; "there is no 'mutuality of obligation' and the contract is unenforceable." *Ex parte McNaughton*, 728 So. 2d 592, 603 (Ala. 1998).

Mr. Byrd, IBT's former client service manager, testified that his attempts to repair ATCU's building from 2008 until 2011 were based not upon DBC's or IBT's warranty obligations, but rather upon the company's pride regarding its service after the sale. (Doc. 85-10 at 9). Mr. Byrd attributed the company's 85 percent "return client rate" to this type of post-warranty effort. The Alabama Supreme Court has expressly recognized such efforts as good business practice rather than any type of implied warranty. *See City of Birmingham v. Cochrane Roofing & Metal Co.*, 547 So. 2d 1159, 1168 (Ala. 1989).

ATCU has not shown any evidence of express or implied warranties in existence after DBC's initial warranties expired on March 6, 2010. Thus, neither DBC nor IBT could

have breached any warranty after their expiration. Consequently, ATCU's claims in Count III are untimely as a matter of law.

### Count IV

In Count IV, ATCU alleges that DBC and IBT fraudulently misrepresented that they would repair, and that they had repaired the building's water intrusion problems. ATCU asserts that the misrepresentations occurred numerous times between ATCU's first request that DBC or IBT evaluate the cause of the leaks and make all necessary repairs, and Mr. Lock's representation in 2012 that IBT had made the repairs necessary to stop further moisture intrusion and to correct the roof leaks. The parties agree that IBT had no further direct communications with ATCU after February 2013.

The statute of limitations for fraudulent misrepresentation is two years in Alabama, and begins to run "when the plaintiff was privy to facts which would 'provoke inquiry in the mind of [a person] of reasonable prudence, and which, if followed up, would have led to the discovery of the fraud.'" Ala. Code § 6-2-38(l); *Auto-Owners Ins. Co. v. Abston*, 822 So. 2d 1187, 1195 (Ala. 2001).

For ATCU's November 10, 2016, claims of fraudulent misrepresentation to be timely under Alabama law, they must have accrued on or after November 10, 2014. But by that time, DBC and/or IBT had been representing to ATCU that they would make the necessary repairs—and that they had made the necessary repairs—for approximately eight years. Further, IBT ceased all site visits and direct communication with ATCU no later than February 2013, more than three years before ATCU filed suit.

ATCU complained of water leaks and the resulting damage from February 2006 all the way up until it filed this lawsuit. ATCU alleges that, from 2006 through 2012, DBC or IBT

repeatedly represented that they would repair the problems and that they were hopeful that those repairs had been successful. If that is so, then ATCU would have known the attempts were unsuccessful and the assurances were unfounded. Therefore, if DBC's or IBT's representations were fraudulent, ATCU discovered that fraud each time the building leaked after IBT made a repair attempt.

Further, IBT made no representations or repair attempts after February 2013. Therefore, no reasonable jury could determine that, if DBC's or IBT's representations were in fact fraudulent, ATCU first discovered the fraud on or after November 16, 2014. The repeated failed attempts to repair the damage and the repeated assurances that the leaks had been repaired—the very conduct that ATCU asserts was fraudulent—should have put ATCU on notice of the fraud it now claims. And every rain that resulted in leaks at ATCU's building should have compelled ATCU to take legal action. Instead, the drops fell, the building leaked, and ATCU chose to wait. And now, the court finds ATCU's fraudulent misrepresentation claims are untimely as a matter of law.

### Count VIII

ATCU's claims based on DBC's and IBT's alleged negligent performance of warranty obligations in Count VIII are untimely for the same reason that its claims for breach of warranty are untimely: any duty DBC or IBT owed ATCU to perform warranty work on the building expired under the terms of the Program Services Agreement on March 6, 2010, more than six years before ATCU filed suit.

Alabama places a two-year statute of limitations on negligence claims, regardless of whether the defendant is a "builder." *Compare* Ala. Code § 6-2-221 *with* Ala. Code § 6-2-38(l). And if DBC's and IBT's attempts to perform their warranty obligations were negligent, certainly ATCU's claims accrued well before November 10, 2014 (two years before filing this suit). First,

any warranty obligations DBC or IBT owed ATCU expired along with the last warranty on March 6, 2010. Further, as previously explained, ATCU provided no evidence or legal authority showing that DBC or IBT had created any additional warranties beyond the original express warranties in their written agreement. Accordingly, neither DBC nor IBT could have negligently performed a warranty obligation after that date.

Second, even if the court applied the discovery rule to create a post March 6, 2010, commencement date for the two-year limitations period, ATCU discovered well before November 10, 2014, that DBC's and IBT's repeated attempts to repair the building had failed. ATCU alleges DBC and IBT made numerous attempts to repair the building's leaks up until as late as February 2013, and ATCU continued notifying them that their attempts had failed. But the rain drops kept falling, and ATCU sat on its legal rights.

Third, ATCU presented no evidence that IBT made any repair attempts under any alleged warranty within two years of filing its negligence claims. Even if the court assumes as true ATCU's assertion that IBT made its last site visit in February 2013, it provided no evidence that IBT made any repairs within two years of ATCU's filing suit on November 10, 2014—much less any evidence of repair attempts that were considered part of any warranty obligation.

Although ATCU alleges that GKL was performing work on behalf of IBT as it made site visits through 2015, ATCU provided no evidence to that effect. In contrast, IBT produced sworn testimony from GKL that it never acted as or represented itself as IBT's agent. In light of such evidence, ATCU's allegation is "not significantly probative," and is insufficient to prevent the court from granting summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 242, 249–50.

For the foregoing reasons, ATCU's claims that DBC and IBT negligently performed

warranty obligations are untimely as a matter of law. Therefore, IBT is entitled to summary judgment as to Count VIII.

### Statute of Repose

Although the court concludes that each of ATCU's claims is untimely as a matter of law under the relevant statute of limitations, it will briefly address IBT's statute of repose argument. IBT argues that if it is a successor in interest or mere continuation of DBC, then Ala. Code § 6-5-221(a)'s seven-year statute of repose bars ATCU's claims.

However, the court concludes that the 13-year repose period in the 2011 version of Ala. Code § 6-5-221applies to ATCU's claims. Alabama applies the statute in effect at the time the claims accrued. *See Bielski v. Alred Saliba Corp.*, 984 F. Supp. 2d 1170, 1174 (M.D. Ala. 2013) (while Alabama courts have not squarely addressed the issue, statutes of repose are substantive rather than remedial law, and therefore apply only to claims that accrue after the statute's effective date); *see also Jones v. Casey*, 445 So. 2d 873, 875 (Ala. 1983) ("retrospective application of a statute is generally not favored, absent an express statutory provision or clear legislative intent."). ATCU's alleged injuries and damages occurred well before the 2011 amendment to § 6-5-221, so that version of the statute applies to ATCU's claims.

ATCU filed this suit in November 2016, which is less than 13 years after substantial completion of ATCU's building in March 2006. Consequently, the statute of repose does not bar ATCU's claims.

### E.  Equitable Estoppel as a Defense to IBT's Statute of Limitations Defense

Having concluded that the relevant statute of limitations had expired as to all claims before the November 10, 2016, filing of this lawsuit, the court now addresses ATCU's argument that IBT

should be estopped from raising the statute of limitations as a defense.

The doctrine of equitable estoppel prevents "a party from asserting rights under a general rule of law when his own conduct renders the assertion of such rights contrary to equity and good conscience." *Pierce v. Hand, Arendall, Bedsole, Greaves & Johnston*, 678 So. 2d 765, 768 (Ala. 1996). The Supreme Court of Alabama provided the three basic elements of equitable estoppel in *Pierce*: 1) "[T]he actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence;" 2) "the other relies upon that communication;" and 3) "the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct." *Id.* (quoting Dobbs, Remedies § 2.3 (1973)).

In *City of Birmingham v. Cochrane Roofing & Metal Co.*, the Supreme Court of Alabama held that "if a defendant either fraudulently or innocently represents to the plaintiff that he will remedy a problem, and relying on these representations the plaintiff is induced not to file a lawsuit or take any action, the defendant may be estopped from raising the statute of limitations as a defense." 547 So. 2d 1159, 1167 (Ala. 1989) (citing *Mason v. Mobile Cty*, 410 So. 2d 19 (1982)). However, the court also tempered this rule by requiring the plaintiff's reliance to be *reasonable*. *Id.* In other words, a defendant should not be estopped from raising the statute of limitations defense if no reasonable person would have allowed the limitations period to expire, despite the alleged inducement, regardless of whether that inducement was fraudulent or innocent.

In *Cochrane Roofing*, the Supreme Court of Alabama considered whether the defendant architect, building contractor, and roofing sub-contractor were estopped from raising a statute of limitations defense because they had cooperated in attempting to repair a roof that they had designed and constructed for the City of Birmingham beyond the warranty period provided in the

contract. The court found that, under the contract, a cause of action for breach of the two-year warranty for workmanship and materials would not have accrued until March 1975. And, despite the defendants' continued repair attempts through 1979, the court determined the six-year statute of limitations would have expired in March 1981. The court held that it was unreasonable for the City to delay until March 1983—approximately two years after the statute of limitations expired—before filing suit, even though the parties made repair attempts several years beyond the expiration of warranties. *Id.* at 1161–63.

In so finding, the court acknowledged that "there must be some standard of reasonableness in applying estoppel principles," and noted that the City admitted that it was aware of the roof's water intrusion issues from the time it moved into the building. *Id.* at 1167. The court also considered that the City was aware of its right to sue the defendants, and that the six-year limitations period provided the City with ample time to evaluate whether it could succeed in such a lawsuit. Therefore, the court held, the defendants' voluntary efforts to repair the building over nearly six years did not estop the defendants from asserting the statute of limitations defense because "no reasonable person would have allowed the statute of limitations to expire, in reliance on the defendants' actions." *Id.*

In reaching its decision in *Cochrane Roofing*, the Supreme Court of Alabama highlighted the importance of balancing the principle of equitable estoppel with the policy behind the statute of limitations. The court stated: "Clearly, estoppel was not meant to defeat the statute of limitations defense in every case where a defendant attempts to remedy problems that might otherwise lead to a lawsuit." 547 So. 2d at 1168.

The court also recognized another important policy within Alabama that "[i]t makes good business sense to maintain a client's goodwill by assisting him in any way possible, even after the

36

formal contractual relationship has ended." *Id.* The court noted that a business's best interest is to assist its customers even after its contractual obligation to do so has ended, and to hold that this type of continued assistance extends a business's liability would force businesses to choose between maintaining a good business relationship with their clients and protecting themselves from liability by not extending the limitations period. *Cochrane Roofing*, 547 So. 2d at 1168.

Here, ATCU argues that IBT's numerous inspections, repairs, and representations induced ATCU to refrain from taking legal action against IBT. However, ATCU was aware of the building's leaks before the issuance of the certificate of substantial completion, within four to six months of occupying the building in January 2006, and rain drops kept falling on its members' heads for the subsequent ten years leading up to the time it finally filed this lawsuit. Just like the City of Birmingham was aware of its right to sue the defendants in *Cochrane Roofing*, ATCU was certainly aware of its right to sue DBC and IBT. And just like the City of Birmingham, ATCU had years to determine if it should sue DBC and IBT. Yet ATCU waited until November 10, 2016, to file suit, which was more than ten years after first discovering the building's water leaks, more than eight years after DBC dissolved, more than six years after the longer of its two contractual warranties expired, and approximately four years after IBT did any work.

Therefore, applying the court's rationale in *Cochrane Roofing* to the substantially similar facts of the present case, this court concludes that no reasonable entity in ATCU's position would have allowed the statute of limitations to expire before bringing this lawsuit on the basis that the defendants' unsuccessful actions were inducing it not to file suit. Nothing before the court suggests IBT offered its post-warranty repairs in exchange for ATCU's promise not to sue or that IBT otherwise coaxed ATCU into delaying its decision to take legal action.

But aside from its general assertion that IBT's assurances and attempts to repair the roof

induced it to refrain from filing suit, ATCU also claims that IBT *fraudulently* induced it to refrain

from suing IBT. ATCU bases this proposition on IBT's failure to disclose Clarks Roofing's

determination that the building's water intrusion was caused by a design flaw. However, the court

finds the alleged suppression had no effect on the timeliness of ATCU's lawsuit because, by the

time the alleged suppression occurred, ATCU had already firmly established an unwavering

willingness to splash about in its sea of troubles rather than change course to seek safe harbor in the

courts.

The alleged fraud centers on an email that IBT's client services manager received in 2011

from Clarks Roofing. (Doc. 82-1 at 2). The email provides a quote to install an arched drip edge on

ATCU's building, and explains that the roofing company was unable to install a "cleat" on the

front of the roof because its front edge was badly designed. The email from Clarks Roofing also

states that the roofing manufacturer, the EIFS installer, and the roofing installer must have known

about the defect. After receiving the email, IBT's client services manager forwarded it to his

colleagues at IBT, but no one ever informed ATCU of the email or its contents.

ATCU argues that IBT's failure to pass along this information induced it to refrain from

suing IBT. However, IBT received Clarks Roofing's email in October 2011, after numerous leaks

had been discovered, and after DBC and IBT had made many failed attempts to solve the

building's problems. By that time, ATCU should have been painfully aware that the roof had a

design flaw, the materials were shoddy, or the building was improperly constructed, *and* that IBT

was unwilling or incapable of correcting the building's water intrusion problems.

The basic function of a roof and walls is to keep the weather out. ATCU's roof and walls let

weather in, and had been doing so for approximately five years at the time of the alleged fraudulent

suppression. Also, by October 2011, ATCU had already allowed both express warranties to expire

without taking any legal action. But not only did it allow the warranties to expire, ATCU then allowed the problems to continue for six more years before filing this suit. So ATCU waited approximately nine years after the most relevant warranty had expired in March 2007 to file suit—despite those rain drops that were falling on its head throughout that time. Nothing suggests that knowledge of a third party's opinion that the roof was poorly designed would have changed ATCU's course of action. In fact, everything points to the contrary.

For this reason, and for all the reasons previously stated, the court finds that even if IBT purposefully concealed the email stating that the roof and walls were poorly designed, ATCU already had ample evidence that its building had design issues. It also had ample time and opportunity to sue IBT before that event occurred, and even some time after—just not five years later. Thus, the court finds that no reasonable juror could find that IBT's failure to disclose a third party's conclusion that ATCU's building was poorly designed induced ATCU to refrain from suing IBT. Nor could any reasonable juror conclude that ATCU suffered actual damage as a proximate result of IBT's failure to disclose that diagnosis. ATCU has certainly suffered damage, but any damage resulting from its unreasonable delay in filing this lawsuit was not fraudulently induced.

Therefore, the court finds that the doctrine of equitable estoppel does not apply in this case, and does not prevent IBT from asserting the statute of limitations defense as to any of ATCU's claims.

### ATCU's Motion to Amend its Complaint

ATCU alleges IBT's failure to disclose Clarks Roofing's October 2011 email constitutes fraudulent suppression, and *may* indicate that IBT committed other fraudulent acts during the years leading up to this litigation. Therefore, ATCU seeks to file a third amended complaint—its

fourth attempt at filing a complaint in this lawsuit—to add a fraudulent suppression claim, and seeks further discovery on the matter. For the reasons stated below, the court will DENY the motion.

In Alabama, a fraudulent suppression claim requires a plaintiff to produce substantial evidence establishing that 1) the defendant had a duty to disclose an existing material fact; 2) the defendant suppressed that material fact; 3) the defendant's suppression of that fact induced the plaintiff to act or refrain from acting; and 4) the plaintiff suffered actual damage as a proximate result. *Booker v. United American Ins. Co.*, 700 So. 2d 1333, 1339 (Ala. 1997). Further, Fed. R. Civ. P. Rule 9(b) requires complainants to plead fraud claims with particularity.

ATCU's proposed addition of a fraudulent suppression claim based on IBT's failure to disclose the Clarks Roofing email fails on the first element. Nothing in the record reveals that, by the time IBT received the email from Clarks Roofing in October 2011, IBT owed ATCU any duty to disclose anything to ATCU. All IBT's contractual or warranty obligations to ATCU had expired by that time. Further, no fiduciary or other type of relationship created such a duty to disclose.

The Supreme Court of Alabama has held that "whether one has a duty to speak depends on a fiduciary, or other, relationship of the parties, the value of the particular fact, the relative knowledge of the parties, and other circumstances of the case . . . . When the parties to a transaction deal with each other at arm's length, with no confidential relationship, no obligation to disclose information arises when the information is not requested." *Mason v. Chrysler Corp.*, 653 So. 2d 951, 954–955 (Ala. 1995). ATCU has not submitted any evidence tending to show that IBT's interactions or relationship with ATCU were anything more than IBT simply trying to maintain its goodwill well beyond the end of its contractual duties.

ATCU's potential fraudulent suppression claim also fails on the third and fourth elements

40

for the same reasons its argument that IBT fraudulently induced it to refrain from filing suit failed. While perhaps the specific flaws that SWA found may not have been openly obvious, ATCU cannot deny that the building's general design flaws regarding its waterproofing were overwhelmingly and painfully obvious for more than five years before Clarks Roofing's email. As previously stressed, new properly designed and constructed roofs and walls should not leak.

Ultimately, ATCU endured nearly ten years of faulty waterproofing before it finally contacted a third party to investigate the source of the problem. Six years—the longest possible statute of limitations—of rain drops causing leaks in a building should put a reasonable person on notice that he should more fully investigate the building's problems. ATCU's failure to do so causes the court to conclude that no reasonable juror could find that IBT's failure to disclose Clarks Roofing's opinion about the roof induced or explains ATCU's failure to bring its claims within the applicable statute of limitations period. Consequently, neither could a reasonable juror find that the failure to disclose injured ATCU in any way.

Finally, to the extent ATCU seeks to amend its complaint so that it can conduct more discovery in search of more instances of fraudulent conduct, the motion is also due to be denied. Rule 9(b) of the Fed. R. Civ. P. provides heightened pleading requirements for fraud-based claims. To satisfy the rule, ATCU's fraud complaint must set forth the following:

> (1) Precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997).

ATCU's motion for leave to amend its complaint contains none of the above requirements

regarding allegations that IBT engaged in fraudulent conduct beyond the suppression of the Clarks Roofing email. Rather, it states only that "[e]vidence of DBC/IBT's fraudulent suppression was uncovered based on very limited discovery . . . raising the very real possibility that DBC/IBT suppressed evidence of other design and construction defects that resulted in moisture intrusion and damage." The Eleventh Circuit has stated that "[t]he particularity rule serves an important purpose in fraud actions by alerting defendants to the *precise* misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (emphasis added). In other words, Rule 9(b) exists to prevent complainants from crying "fraud" only to go on a fishing expedition during discovery to try to find some evidence of fraud.

For these reasons, the court concludes that no reasonable juror could conclude that IBT fraudulently suppressed the Clarks Roofing email's contents from ATCU to its injury, and ATCU has not presented any facts satisfying Fed. R. Civ. P. Rule 9(b)'s heightened pleading requirements for fraud. Consequently, an amended complaint would be futile. Therefore, the court will DENY ATCU's motion to amend its complaint to give it opportunity for a fishing expedition, especially when it slept too late to catch the boat.

## IV. CONCLUSION

For the reasons explained above, the court will DENY ATCU's motion to strike IBT's motion for summary judgment (doc. 83); DENY its motion to strike IBT's reply brief in support of its motion for summary judgment (doc. 97); and DENY ATCU's motion to file a third amended complaint (doc. 82). Finally, the court will GRANT summary judgment in favor of IBT on all counts because they are untimely under any theory, and DIRECT the Clerk to close the case.

The court will enter a separate Order consistent with this Memorandum Opinion.

42

**DONE** this 10th day of August, 2018.

_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE